NINIA BAEHR, GENORA DANCEL, TAMMY RODRIGUES, ANTOINETTE PREGIL, PAT LAGON, JOSEPH MELILIO, Plaintiffs–Appellants, v. JOHN C. LEWIN, in his official capacity as Director of the Department of Health, State of Hawaii, Defendant–Appellee

NO. 15689

(CIV. NO. 91–1394)

MAY 5, 1993

MOON, ACTING C.J., LEVINSON, J., INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF LUM, C.J., RECUSED, INTERMEDIATE COURT OF APPEALS JUDGE HEEN, IN PLACE OF KLEIN, J., RECUSED, AND RETIRED JUSTICE HAYASHI,* ASSIGNED BY REASON OF VACANCY

---

*Retired Associate Justice Hayashi, who was assigned by reason of vacancy to sit with the justices of the supreme court pursuant to article VI, § 2 of the Constitution of the State of Hawaii and HRS § 602–10 (1985), and whose temporary assignment expired prior to the filing of this opinion, would have joined in the dissent with Associate Judge Heen.

OPINION BY LEVINSON, J., IN WHICH
MOON, C.J., JOINS; BURNS, J.,
CONCURRING IN THE RESULT

The plaintiffs–appellants Ninia Baehr (Baehr), Genora Dancel (Dancel), Tammy Rodrigues (Rodrigues), Antoinette Pregil (Pregil), Pat Lagon (Lagon), and Joseph Melilio (Melilio) (collectively "the plaintiffs") appeal the circuit court's order (and judgment entered pursuant thereto) granting the motion of the defendant–appellee

John C. Lewin (Lewin), in his official capacity as Director of the Department of Health (DOH), State of Hawaii, for judgment on the pleadings, resulting in the dismissal of the plaintiffs' action with prejudice for failure to state a claim against Lewin upon which relief can be granted. Because, for purposes of Lewin's motion, it is our duty to view the factual allegations of the plaintiffs' complaint in a light most favorable to them (*i.e.*, because we must deem such allegations as true) and because it does *not* appear beyond doubt that the plaintiffs cannot prove any set of facts in support of their claim that would entitle them to the relief they seek, we hold that the circuit court erroneously dismissed the plaintiffs' complaint. Accordingly, we vacate the circuit court's order and judgment and remand this matter to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

On May 1, 1991, the plaintiffs filed a complaint for injunctive and declaratory relief in the Circuit Court of the First Circuit, State of Hawaii, seeking, *inter alia*: (1) a declaration that Hawaii Revised Statutes (HRS) § 572–1 (1985)[1] — the section of the Hawaii Marriage Law enumerating the [r]equisites of [a] valid marriage contract" —

---

[1] HRS § 572–1 provides:

**Requisites of valid marriage contract.** In order to make valid the marriage contract, it shall be necessary that:

(1) The respective parties do not stand in relation to each other of ancestor and descendant of any degree whatsoever, *brother and sister* of the half as well as to the whole blood, *uncle and niece, aunt and nephew*, whether the relationship is legitimate or illegitimate;

(2) Each of the parties at the time of contracting the marriage is at least sixteen years of age; provided that with the written approval of the family court of the circuit court within which

is unconstitutional insofar as it is construed and applied by the DOH to justify refusing to issue a marriage license on the *sole* basis that the applicant couple is of the same sex; and (2) preliminary and permanent injunctions prohibiting the future withholding of marriage licenses on that sole basis.

In addition to the necessary jurisdictional and venue–related averments, the plaintiffs' complaint alleges the

---

the minor resides, it shall be lawful for a person under the age of sixteen years, but in no event under the age of fifteen years, to marry, subject to section 572–2 [relating to consent of parent or guardian];

(3) The *man* does not at the time have any lawful *wife* living and that the *woman* does not at the time have any lawful *husband* living;

(4) Consent of neither party to the marriage has been obtained by force, duress, or fraud;

(5) Neither of the parties is a person afflicted with any loathsome disease concealed from, and unknown to, the other party;

(6) It shall in no case be lawful for any person to marry in the State without a license for that purpose duly obtained from the agent appointed to grant marriage licenses; and

(7) The marriage ceremony be performed in the State by a person or society with a valid license to solemnize marriages and the *man and woman* to be married and the person performing the marriage ceremony be all physically present at the same place and time for the marriage ceremony.

HRS § 572–1 (1985) (emphasis added). In 1984, the legislature amended the statute to delete the then existing prerequisite that "[n]either of the parties is impotent or *physically incapable of entering into the marriage state*[.]" Act 119, § 1, 1984 Haw. Sess. Laws 238–39 (emphasis added). Correlatively, section 2 of Act 119 amended HRS § 580–21 (1985) to delete as a ground for annulment the fact "that one of the parties was impotent *or physically incapable of entering into the marriage state*" at the time of the marriage. *Id.* at 239 (emphasis added). The legislature's own actions thus belie the dissent's wholly unsupported declaration, at 594–95 n.8, that "the purpose of HRS § 572–1 is to promote and protect propagation . . . ."

following facts: (1) on or about December 17, 1990, Baehr/ Dancel, Rodrigues/Pregil, and Lagon/Melilio (collectively "the applicant couples") filed applications for marriage licenses with the DOH, pursuant to HRS § 572–6 (Supp. 1992);[2] (2) the DOH denied the applicant couples'

---

[2] HRS § 572–6 provides:

**Application; license; limitations.** To secure a license to marry, the persons applying for the license shall appear personally before an agent authorized to grant marriage licenses and shall file with the agent an application in writing. The application shall be accompanied by a statement signed and sworn to by each of the persons, setting forth: the person's full name, date of birth, residence; their relationship, if any; the full names of parents; and that all prior marriages, if any, have been dissolved by death or dissolution. If all prior marriages have been dissolved by death or dissolution, the statement shall also set forth the date of death of the last prior spouse or the date and jurisdiction in which the last decree of dissolution was entered. Any other information consistent with the standard marriage certificate as recommended by the Public Health Service, National Center for Health Statistics, may be requested for statistical or other purposes, subject to approval of and modification by the department of health; provided that the information shall be provided at the option of the applicant and no applicant shall be denied a license for failure to provide the information. The agent shall indorse on the application, over the agent's signature, the date of the filing thereof and shall issue a license which shall bear on its face the date of issuance. Every license shall be of full force and effect for thirty days commencing from and including the date of issuance. After the thirty–day period, the license shall become void and no marriage ceremony shall be performed thereon.

It shall be the duty of every person, legally authorized to issue licenses to marry, to immediately report the issuance of every marriage license to the agent of the department of health in the district in which the license is issued, setting forth all the facts required to be stated in such manner and on such form as the department may prescribe.

HRS § 572–6 (Supp. 1992).

HRS § 572–5(a) (Supp. 1992) provides in relevant part that "[t]he department of health shall appoint . . . one or more suitable persons as

marriage license applications solely on the ground that the applicant couples were of the same sex;[3] (3) the applicant couples have complied with all marriage contract requirements and provisions under HRS ch. 572, except that each applicant couple is of the same sex; (4) the applicant couples are otherwise eligible to secure marriage licenses from the DOH, absent the statutory prohibition or construction of HRS § 572–1 excluding couples of the same sex from securing marriage licenses; and (5) in denying the applicant couples' marriage license applications, the DOH was acting in its official capacity and under color of state law.

Based on the foregoing factual allegations, the plaintiffs' complaint avers that: (1) the DOH's interpretation and application of HRS § 572–1 to deny same–sex couples access to marriage licenses violates the plaintiffs' right to privacy, as guaranteed by article I, section 6 of the Hawaii

---

agents authorized to grant marriage licenses . . . in each judicial circuit."

[3] Exhibits "A," "C," and "D," attached to the plaintiffs' complaint, purport to be identical letters dated April 12, 1991, addressed to the respective applicant couples, from the DOH's Assistant Chief and State Registrar, Office of Health Status Monitoring, which stated:

> This will confirm our previous conversation in which we indicated that *the law of Hawaii does not treat a union between members of the same sex as a valid marriage.* We have been advised by our attorneys that *a valid marriage within the meaning of ch. 572, Hawaii Revised Statutes, must be one in which the parties to the marriage contract are of different sexes.* In view of the foregoing, *we decline to issue a license for your marriage to one another since you are both of the same sex and for this reason are not capable of forming a valid marriage contract within the meaning of ch. 572.* Even if we did issue a marriage license to you, *it would not be a valid marriage under Hawaii law.*

(Emphasis added.)

Constitution,[4] as well as to the equal protection of the laws and due process of law, as guaranteed by article I, section 5 of the Hawaii Constitution;[5] (2) the plaintiffs have no plain, adequate, or complete remedy at law to redress their alleged injuries; and (3) the plaintiffs are presently suffering and will continue to suffer irreparable injury from the DOH's acts, policies, and practices in the absence of declaratory and injunctive relief.

On June 7, 1991, Lewin filed an amended answer to the plaintiffs' complaint. In his amended answer, Lewin asserted the defenses of failure to state a claim upon which relief can be granted, sovereign immunity, qualified immunity, and abstention in favor of legislative action.[6] With regard to the plaintiffs' factual allegations, Lewin admitted: (1) his residency and status as the director of the DOH; (2) that on or about December 17, 1990, the applicant couples personally appeared before an

---

[4] Article I, section 6 of the Hawaii Constitution provides:

The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right.

HAW. CONST. art. I, § 6 (1978).

[5] Article I, section 5 of the Hawaii Constitution provides:

No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

HAW. CONST. art. I, § 5 (1978).

[6] Lewin's motion for judgment on the pleadings relied exclusively on the ground that the plaintiffs' complaint failed to state a claim upon which relief could be granted, and the circuit court granted the motion and entered judgment in Lewin's favor on that basis alone. Accordingly, the merits of Lewin's other defenses are not at issue in this appeal, and we do not reach them.

authorized agent of the DOH and applied for marriage licenses; (3) that the applicant couples' marriage license applications were denied on the ground that each couple was of the same sex; and (4) that the DOH did not address the issue of the premarital examination required by HRS § 572–7(a) (Supp. 1992)[7] "upon being advised" that the applicant couples were of the same sex. Lewin denied all of the remaining allegations of the complaint.

On July 9, 1991, Lewin filed his motion for judgment on the pleadings, pursuant to Hawaii Rules of Civil Procedure (HRCP) 12(h)(2) (1990)[8] and 12(c) (1990),[9] and to dismiss the plaintiffs' complaint, pursuant to HRCP

---

[7] In substance, HRS § 572–7(a) (Supp. 1992) requires "the female" to accompany a marriage license application with a signed physician's statement verifying that she has been given a serological test for immunity against rubella and has been informed of the adverse effects of rubella on fetuses. The statute exempts from the examination requirement those females who provide proof of live rubella virus immunization or laboratory evidence of rubella immunity, "or who, by reason of age or other medically determined condition [are] not and never will be physically able to conceive a child." *Id.*

[8] HRCP 12(h)(2) (1990) provides in relevant part that "[a] defense of failure to state a claim upon which relief can be granted . . . may be made . . . by motion for judgment on the pleadings . . . ."

[9] HRCP 12(c) provides:

**Motion for Judgment on the Pleadings.** After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

HRCP 12(c) (1990).

12(b)(6) (1990),[10] and memorandum in support thereof in

---

HRCP 56 provides in relevant part:

**(b) For Defending Party.** A party against whom a claim . . . is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

**(c) Motion and Proceedings thereon.** The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . .

. . . .

**(e) Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in any affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. . . .

HRCP 56 (1990).

[10] HRCP 12(b) provides in relevant part:

**(b) How Presented.** Every defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted . . . . A motion making any of these defenses shall be made before pleading if a further pleading is permitted. . . . If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

HRCP 12(b) (1990).

the circuit court. The memorandum was unsupported by and contained no references to any affidavits, depositions, answers to interrogatories, or admissions on file. Indeed, the record in this case suggests that the parties have not conducted any formal discovery.

In his memorandum, Lewin urged that the plaintiffs' complaint failed to state a claim upon which relief could be granted for the following reasons: (1) the state's marriage laws "contemplate marriage as a union between a man and a woman"; (2) because the only legally recognized right to marry "is the right to enter a heterosexual marriage, [the] plaintiffs do not have a cognizable right, fundamental or otherwise, to enter into state–licensed homosexual marriages";[11] (3) the state's marriage laws do not "burden, penalize, infringe, or interfere in any way with the [plaintiffs'] private relationships"; (4) the state is under no obligation "to take affirmative steps to provide homosexual unions with its official approval"; (5) the state's marriage laws "protect and foster and may help to perpetuate the basic family unit, regarded as vital to society, that provides status and a nurturing environment to

---

[11] "Homosexual" and "same–sex" marriages are not synonymous; by the same token, a "heterosexual" same–sex marriage is, in theory, not oxymoronic. A "homosexual" person is defined as "[o]ne sexually attracted to another of the same sex." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 839 (16th ed. 1989). "Homosexuality" is "sexual desire or behavior directed toward a person or persons of one's own sex." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 680 (1989). Conversely, "heterosexuality" is "[s]exual attraction for one of the opposite sex," TABER'S CYCLOPEDIC MEDICAL DICTIONARY at 827, or "sexual feeling or behavior directed toward a person or persons of the opposite sex." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE at 667. Parties to "a union between a man and a woman" may or may not be homosexuals. Parties to a same–sex marriage could theoretically be either homosexuals or heterosexuals.

children born to married persons" and, in addition, "constitute a statement of the moral values of the community in a manner that is not burdensome to [the] plaintiffs"; (6) assuming the plaintiffs are homosexuals (a fact not pleaded in the plaintiffs' complaint),[12] they "are neither a suspect nor a quasi–suspect class and do not require heightened judicial solicitude"; and (7) even if heightened judicial solicitude is warranted, the state's marriage laws "are so removed from penalizing, burdening, harming, or otherwise interfering with [the] plaintiffs and their relationships and perform such a critical function in society that they must be sustained."

The plaintiffs filed a memorandum in opposition to Lewin's motion for judgment on the pleadings on August 29, 1991. Citing *Au v. Au*, 63 Haw. 210, 626 P.2d 173 (1981), and *Midkiff v. Castle & Cooke, Inc.*, 45 Haw. 409, 368 P.2d 887 (1962), they argued that, for purposes of Lewin's motion, the circuit court was bound to accept all of the facts alleged in their complaint as true and that the complaint therefore could not be dismissed for failure to state a claim unless it appeared beyond doubt that they could prove no set of facts that would entitle them to the relief sought. Proclaiming their homosexuality and asserting a fundamental constitutional right to sexual orientation, the plaintiffs reiterated their position that the DOH's refusal to issue marriage licenses to the applicant couples violated their rights to privacy, equal protection of the laws, and due process of law under article I, sections 5 and 6 of the Hawaii Constitution.

---

[12] Lewin is correct that the plaintiffs' complaint does not allege that the plaintiffs, or any of them, are homosexuals. Thus it is Lewin, who, by virtue of his motion for judgment on the pleadings, has sought to place the question of homosexuality in issue.

The circuit court heard Lewin's motion on September 3, 1991, and, on October 1, 1991, filed its order granting Lewin's motion for judgment on the pleadings on the basis that Lewin was "entitled to judgment in his favor as a matter of law" and dismissing the plaintiffs' complaint with prejudice.[13] The plaintiffs' timely appeal followed.

## II.  JUDGMENT ON THE PLEADINGS WAS ERRONEOUSLY GRANTED.

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. *Ravelo v. County of Hawaii*, 66 Haw. 194, 198, 658 P.2d 883, 886 (1983) (quoting *Midkiff*, 45 Haw. at 414, 368 P.2d at 890); *Marsland v. Pang*, 5 Haw. App. 463, 474, 701 P.2d 175, 185–86, *cert. denied*, 67 Haw. 686, 744 P.2d 781 (1985). We must therefore view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternative theory. *Ravelo*, 66 Haw. at 199, 658 P.2d at 886. For this reason, in reviewing the circuit court's order dismissing the plaintiffs' complaint in this case, our consideration is strictly limited to the allegations of the complaint, and we must deem those allegations to be true. *Au*, 63 Haw. at 214, 626 P.2d at 177 (1981).

An HRCP 12(c) motion serves much the same purpose as an HRCP 12(b)(6) motion, except that it is made after

---

[13] A final and appealable judgment in Lewin's favor and against the plaintiffs was filed contemporaneously with the order granting the motion for judgment on the pleadings.

the pleadings are closed. *Marsland*, 5 Haw. App. at 474, 701 P.2d at 186. " 'A Rule 12(c) motion . . . for a judgment on the pleadings only has utility when all material allegations of fact are admitted in the pleadings and only questions of law remain.' " *Id.* at 475, 701 P.2d at 186 (citing 5 WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1357 (1969)).

Based on the foregoing authority, it is apparent that an order granting an HRCP 12(c) motion for judgment on the pleadings must be based solely on the contents of the pleadings. A claim that is evidentiary in nature and requires findings of fact to resolve cannot properly be disposed of under the rubric of HRCP 12(c). *Cf. Nawahie v. Goo Wan Hoy*, 26 Haw. 111 (1921) ("Only such facts as were properly before the court below at the time of the rendition of the decree appealed from and which appear in the record . . . on appeal will be considered. All other matters will be treated as surplusage and of course will be disregarded.") We have recognized that consideration of matters outside the pleadings transforms a motion seeking dismissal of a complaint into an HRCP 56 motion for summary judgment. *See Au*, 63 Haw. at 213, 626 P.2d at 176; *Del Rosario v. Kohanuinui*, 52 Haw. 583, 483 P.2d 181 (1971); HRCP 12(b) (1990); *cf.* HRCP 12(c) (1990). But resort to matters outside the record, by way of "[u]nverified statements of fact in counsel's memorandum or representations made in oral argument" or otherwise, cannot accomplish such a transformation. *See Au*, 63 Haw. at 213, 626 P.2d at 177; *cf. Asada v. Sunn*, 66 Haw. 454, 455, 666 P.2d 584, 585 (1983); *Mizoguchi v. State Farm Mut. Auto. Ins. Co.*, 66 Haw. 373, 381–82, 663 P.2d 1071, 1076–77 (1983); HRCP 56(e) (1990).

## A. The Circuit Court Made Evidentiary Findings of Fact.

Notwithstanding the absence of any evidentiary record before it, the circuit court's October 1, 1991 order granting Lewin's motion for judgment on the pleadings contained a variety of findings of fact. For example, the circuit court "found" that: (1) HRS § 572–1 "does not infringe upon a person's individuality or lifestyle decisions, *and none of the plaintiffs has provided testimony to the contrary*"; (2) HRS § 572–1 "does not . . . restrict [or] burden . . . the exercise of the right to engage in a homosexual lifestyle"; (3) Hawaii has exhibited a "history of tolerance for all peoples and their cultures"; (4) *"the plaintiffs have failed to show* that they have been ostracized or oppressed in Hawaii and have opted instead to rely on a general statement of historic problems encountered by homosexuals which may not be relevant to Hawaii"; (5) "homosexuals in Hawaii have not been relegated to a position of 'political powerlessness.' . . . *[T]here is no evidence* that homosexuals and the homosexual legislative agenda have failed to gain legislative support in Hawaii"; (6) *the "[p]laintiffs have failed to show* that homosexuals constitute a suspect class for equal protection analysis under [a]rticle I, [s]ection 5 of the Hawaii State Constitution;" (7) "the issue of whether homosexuality constitutes an immutable trait has generated much dispute in the relevant scientific community";[14] and (8) HRS § 572–1 "is obviously designed to promote the general welfare interests of the

---

[14] For the reasons stated, *infra*, in this opinion, it is irrelevant, for purposes of the constitutional analysis germane to this case, whether homosexuality constitutes "an immutable trait" because it is immaterial whether the plaintiffs, or any of them, are homosexuals. Specifically, the issue is not material to the equal protection analysis

community by sanctioning traditional man–woman family units and procreation." (Emphasis added.)

Although not expressly denominated as such, the circuit court's order also contained a number of conclusions of law.[15] These included: (1) "[t]he right to enter into a homosexual marriage is not a fundamental right protected by [a]rticle I, [s]ection 6 of the Hawaii State Constitution"; (2) the right to be free from the denial of a person's

_____

set forth in section II. C of this opinion, *infra* at 557–580. Its resolution is unnecessary to our ruling that HRS § 572–1, both on its face as applied, denies same–sex couples access to the marital status and its concomitant rights and benefits. Its resolution is also unnecessary to our conclusion that it is the state's regulation of access to the marital status, on the basis of the applicants' sex, that gives rise to the question whether the applicant couples have been denied the equal protection of the laws in violation of article I, section 5 of the Hawaii Constitution. *See infra* at 558–571. And, in particular, it is immaterial to the exercise of "strict scrutiny" review, *see infra* at 571–580, inasmuch as we are unable to perceive any conceivable relevance of the issue to the ultimate conclusion of law — which, in the absence of further evidentiary proceedings, we cannot reach at this time — regarding whether HRS § 572–1 furthers compelling state interests and is narrowly drawn to avoid unnecessary abridgments of constitutional rights. *See infra* at 580–81.

In light of the above, we disagree with Chief Judge Burns's position that "questions whether heterosexuality, homosexuality, bisexuality, and asexuality are 'biologically fated' are relevant questions of fact[.]" Concurring opinion at 587. This preoccupation seems simply to restate the immaterial question whether sexual orientation is an "immutable trait."

[15] A "conclusion of law," for present purposes, is either: (1) a "[f]inding by [the] court as determined through application of rules of law"; (2) "[p]ropositions of law which [the] judge arrives at after, and as a result of, finding certain facts in [the] case[;]" or (3) "[t]he final judgment or decree required on [the] basis of facts found[.]" BLACK'S LAW DICTIONARY 290 (6th ed. 1990). The second category may constitute such "mixed questions of fact and law" as "are dependent upon the facts and circumstances of each individual case[.]" *See **Coll v. McCarthy**,* 72 Haw. 20, 28, 804 P.2d 881, 886 (1991).

civil rights or from discrimination in the exercise thereof because of "sexual orientation [is] . . . covered under [a]rticle I, [s]ection 5 of the State Constitution"; (3) HRS § 572–1 "permits heterosexual marriages but not homosexual marriages" and "does not violate the due process clause of [a]rticle I, [s]ection 5 of the Hawaii State Constitution"; (4) HRS § 572–1 "represents a legislative decision to extend the benefits of lawful marriage only to traditional family units which consist of male and female partners"; (5) "[b]ecause [entering into a] homosexual marriage [is not] a fundamental [constitutional] right . . . , the provisions of section 572–1 do not violate the due process clause of [a]rticle I, [s]ection 5 of the Hawaii State Constitution"; (6) "[h]omosexuals do not constitute a 'suspect class' for purposes of equal protection analysis under [a]rticle I, [s]ection 5 of the Hawaii State Constitution"; (7) "a group must have been subject to purposeful, unequal treatment or have been relegated to a position of political powerlessness in order to be considered a 'suspect class' for the purposes of constitutional analysis"; (8) "[a] law which classifies on the basis of race deserves the utmost judicial scrutiny because race clearly qualifies as a suspect classification. The same cannot be convincingly said with respect to homosexuals as a group"; (9) "the classification created by section 572–1 must meet only the rational relationship test"; (10) "[t]he classification of section 572–1 meets the rational relationship test"; (11) "[s]ection 572–1 is clearly a rational, legislative effort to advance the general welfare of the community by permitting only heterosexual couples to legally marry"; and, finally, (12) Lewin "is entitled to judgment in his favor as a matter of law[.]"

In reviewing the circuit court's order on appeal, as noted above, we must deem all of the *factual* allegations of

the plaintiffs' complaint as true or admitted, *see Au*, 63 Haw. at 214, 626 P.2d at 177; *Marsland*, 5 Haw. App. at 475, 701 P.2d at 186, and, in the absence of an evidentiary record, ignore all of the circuit court's findings of fact. *See Au*, 63 Haw. at 213, 626 P.2d at 177; *Marsland*, 5 Haw. App. at 475, 701 P.2d at 186; *cf. Asada*, 66 Haw. at 455, 666 P.2d at 585; *Mizoguchi*, 66 Haw. at 381–82, 663 P.2d at 1076–77; *Nawahie*, 26 Haw. at 111; HRCP 12(c) and 56(e). Ultimately, our task on appeal is to determine whether the circuit court's order, stripped of its improper factual findings, supports its conclusion that Lewin is entitled to judgment as a matter of law and, by implication, that it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief under any alternative theory. *See Ravelo*, 66 Haw. at 198–99; *Au*, 63 Haw. at 214, 626 P.2d at 177; *Marsland*, 5 Haw. App. at 474–75.

We conclude that the circuit court's order runs aground on the shoals of the Hawaii Constitution's equal protection clause and that, on the record before us, unresolved factual questions preclude entry of judgment, as a matter of law, in favor of Lewin and against the plaintiffs. Before we address the plaintiffs' equal protection claim, however, it is necessary as a threshold matter to consider their allegations regarding the right to privacy (and, derivatively, due process of law) within the context of the record in its present embryonic form.

### B. The Right to Privacy Does Not Include a Fundamental Right to Same–Sex Marriage.

It is now well established that " 'a right to personal privacy, or a guarantee of certain areas or zones of privacy,' is implicit in the United States Constitution." *State v. Mueller*, 66 Haw. 616, 618, 671 P.2d 1351, 1353

(1983) (quoting *Roe v. Wade*, 410 U.S. 113, 152, 93 S. Ct. 705, 726, 35 L. Ed. 2d 147 (1973)). And article I, section 6 of the Hawaii Constitution expressly states that "[t]he right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest." HAW. CONST. art. I, § 6 (1978). The framers of the Hawaii Constitution declared that the "privacy concept" embodied in article I, section 6 is to be "treated as a fundamental right[.]" *State v. Kam*, 69 Haw. 483, 493, 748 P.2d 372, 378 (1988) (citing Comm. Whole Rep. No. 15, in 1 Proceedings of the Constitutional Convention of Hawaii of 1978, at 1024 (1980)).

When article I, section 6 of the Hawaii Constitution was being adopted, the 1978 Hawaii Constitutional Convention, acting as a committee of the whole, clearly articulated the rationale for its adoption:

> By amending the Constitution to include a separate and distinct privacy right, it is the intent of your Committee to insure that privacy is treated as a fundamental right for purposes of constitutional analysis. . . . This right is similar to the privacy right discussed in cases such as *Griswold v. Connecticut*, [381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965)], *Eisenstadt v. Baird*, [405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972)], *Roe v. Wade*, etc. It is a right that, though unstated in the federal Constitution, emanates from the penumbra of several guarantees of the Bill of Rights. Because of this, there has been some confusion as to the source of the right and the importance of it. As such, it is treated as a fundamental right subject to interference only when a compelling state interest is demonstrated. By inserting clear and specific language regarding

> this right into the Constitution, your Committee intends to alleviate any possible confusion over the source of the right and the existence of it.

Comm. Whole Rep. No. 15, 1 Proceedings, at 1024. This court cited the same passage in *Mueller*, 66 Haw. at 625–26, 671 P.2d at 1357–58, in an attempt to determine the "intended scope of privacy protected by the Hawaii Constitution." *Id.* at 626, 671 P.2d at 1358. We ultimately concluded in *Mueller* that the federal cases cited by the Convention's committee of the whole should guide our construction of the intended scope of article I, section 6. *Id.*

Accordingly, there is no doubt that, at a minimum, article I, section 6 of the Hawaii Constitution encompasses all of the fundamental rights expressly recognized as being subsumed within the privacy protections of the United States Constitution. In this connection, the United States Supreme Court has declared that "the right to marry is part of the fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause." *Zablocki v. Redhail*, 434 U.S. 374, 384, 98 S. Ct. 673, 680, 54 L. Ed. 2d 618 (1978). The issue in the present case is, therefore, whether the "right to marry" protected by article I, section 6 of the Hawaii Constitution extends to same–sex couples. Because article I, section 6 was expressly derived from the general right to privacy under the United States Constitution and because there are no Hawaii cases that have delineated the fundamental right to marry, this court, as we did in *Mueller*, looks to federal cases for guidance.

The United States Supreme Court first characterized the right of marriage as fundamental in *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942). In *Skinner*, the right to marry

was inextricably linked to the right of procreation. The dispute before the court arose out of an Oklahoma statute that allowed the state to sterilize "habitual criminals" without their consent. In striking down the statute, the *Skinner* court indicated that it was "dealing . . . with legislation which involve[d] *one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race.*" *Id.* at 541, 62 S. Ct. at 1113 (emphasis added). Whether the court viewed marriage and procreation as a single indivisible right, the least that can be said is that it was obviously contemplating unions between men and women when it ruled that the right to marry was fundamental. This is hardly surprising inasmuch as none of the United States sanctioned any other marriage configuration at the time.

The United States Supreme Court has set forth its most detailed discussion of the fundamental right to marry in *Zablocki, supra,* which involved a Wisconsin statute that prohibited any resident of the state with minor children "not in his custody and which he is under obligation to support" from obtaining a marriage license until the resident demonstrated to a court that he was in compliance with his child support obligations. 434 U.S. at 376, 98 S. Ct. at 675. The *Zablocki* court held that the statute burdened the fundamental right to marry; applying the "strict scrutiny" standard to the statute, the court invalidated it as violative of the fourteenth amendment to the United States Constitution. *Id.* at 390–91, 98 S. Ct. at 683. In so doing, the *Zablocki* court delineated its view of the evolution of the federally recognized fundamental right of marriage as follows:

> Long ago, in *Maynard v. Hill*, 125 U.S. 190[, 8 S. Ct. 723, 31 L. Ed. 654] (1888), the Court characterized marriage as "the most important relation

in life," *id.*, at 205, [8 S. Ct., at 726,] and as "the foundation of the family and of society, without which there would be neither civilization nor progress," *id.*, at 211[, 8 S. Ct., at 729]. In **Meyer v. Nebraska**, 262 U.S. 390[, 43 S. Ct. 625, 67 L. Ed. 1042] (1923), the Court recognized that the right "to marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause, *id.*, at 399, [43 S. Ct., at 626,] and in *Skinner v. Oklahoma ex rel. Williamson, supra*, marriage was described as "fundamental to the very existence and survival of the race," 316 U.S., at 541[, 62 S. Ct., at 1113].

. . . .

It is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. As the facts of this case illustrate, it would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society. The woman whom appellee desired to marry had a fundamental right to seek an abortion of their expected child, *see Roe v. Wade, supra*, or to bring the child into life to suffer the myriad social, if not economic, disabilities that the status of illegitimacy brings . . . . Surely, a decision to marry and raise the child in a traditional family setting must receive equivalent protection. And, if appellee's right to procreate means anything at all, it must imply some right to enter the only

relationship in which the State of Wisconsin allows sexual relations legally to take place.

*Id.* at 384–86, 98 S. Ct. at 680–81 (citations and footnote omitted). Implicit in the *Zablocki* court's link between the right to marry, on the one hand, and the fundamental rights of procreation, childbirth, abortion, and child rearing, on the other, is the assumption that the one is simply the logical predicate of the others.

The foregoing case law demonstrates that the federal construct of the fundamental right to marry — subsumed within the right to privacy implicitly protected by the United States Constitution — presently contemplates unions between men and women. (Once again, this is hardly surprising inasmuch as such unions are the only state–sanctioned marriages currently acknowledged in this country.)

Therefore, the precise question facing this court is whether we will extend the *present* boundaries of the fundamental right of marriage to include same–sex couples, or, put another way, whether we will hold that same–sex couples possess a fundamental right to marry. In effect, as the applicant couples frankly admit, we are being asked to recognize a new fundamental right. There is no doubt that "[a]s the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawaii Constitution, we are free to give broader privacy protection [under article I, section 6 of the Hawaii Constitution] than that given by the federal constitution." **Kam**, 69 Haw. at 491, 748 P.2d at 377 (citations omitted). However, we have also held that the privacy right found in article I, section 6 is similar to the federal right and that no "purpose to lend talismanic effect" to abstract phrases such as "intimate decision" or "personal autonomy" can "be inferred from [article I, section 6], any more than . . . from

the federal decisions." *Mueller*, 66 Haw. at 630, 671 P.2d at 1360.

In *Mueller*, this court, in attempting to circumscribe the scope of article I, section 6, found itself ultimately "led back to" the landmark United States Supreme Court cases "in [its] search for guidance" on the issue. *Id.* at 626, 671 P.2d at 1358. In the case that first recognized a fundamental right to privacy, *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678 (1965), the court declared that it was "deal[ing] with a right . . . older than the Bill of Rights[.]" *Id.* at 486, 85 S. Ct. at 1682. And in a concurring opinion, Justice Goldberg observed that judges "determining which rights are fundamental" must look not to "personal and private notions," but

> to the "traditions and [collective] conscience of our people" to determine whether a principle is "so rooted [there] . . . as to be ranked as fundamental." . . . The inquiry is whether a right involved "is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' . . . ."

*Id.* at 493, 85 S. Ct. at 1686–87 (Goldberg, J., concurring) (citations omitted).[16]

Applying the foregoing standards to the present case, we do not believe that a right to same–sex marriage is so rooted in the traditions and collective conscience of our

---

[16] In *Mueller*, this court cited *Palko v. Connecticut*, 302 U.S. 319, 58 S. Ct. 149, 82 L. Ed. 288 (1937), for the proposition that only rights that are implicit in the concept of ordered liberty can be deemed fundamental. Pursuant to that standard, this court held that a prostitute did not have a fundamental right under article I, section 6 of the Hawaii Constitution to conduct business in her own home. 66 Haw. at 628, 630, 671 P.2d at 1359–60.

people that failure to recognize it would violate the funda-
mental principles of liberty and justice that lie at the base
of all our civil and political institutions. Neither do we
believe that a right to same–sex marriage is implicit in the
concept of ordered liberty, such that neither liberty nor
justice would exist if it were sacrificed. Accordingly, we
hold that the applicant couples do not have a fundamental
constitutional right to same–sex marriage arising out of
the right to privacy or otherwise.

Our holding, however, does not leave the applicant
couples without a potential remedy in this case. As we will
discuss below, the applicant couples are free to press their
equal protection claim. If they are successful, the State
of Hawaii will no longer be permitted to refuse marriage
licenses to couples merely on the basis that they are of the
same sex. But there is no fundamental right to marriage
for same–sex couples under article I, section 6 of the
Hawaii Constitution.

C. **Inasmuch as the Applicant Couples Claim
That the Express Terms of HRS § 572–1,
which Discriminates against Same–Sex
Marriages, Violate Their Rights under the
Equal Protection Clause of the Hawaii Con-
stitution, the Applicant Couples Are Enti-
tled to an Evidentiary Hearing to Determine
Whether Lewin Can Demonstrate that HRS
§ 572–1 Furthers Compelling State Interests
and Is Narrowly Drawn to Avoid Unneces-
sary Abridgments of Constitutional Rights.**

In addition to the alleged violation of their constitu-
tional rights to privacy and due process of law, the appli-
cant couples contend that they have been denied the equal
protection of the laws as guaranteed by arti′ɜ˙ section 5

of the Hawaii Constitution. On appeal, the plaintiffs urge and, on the state of the bare record before us, we agree that the circuit court erred when it concluded, *as a matter of law*, that: (1) homosexuals do not constitute a "suspect class" for purposes of equal protection analysis under article I, section 5 of the Hawaii Constitution;[17] (2) the classification created by HRS § 572–1 is not subject to "strict scrutiny," but must satisfy only the "rational relationship" test; and (3) HRS § 572–1 satisfies the rational relationship test because the legislature "obviously designed [it] to promote the general welfare interests of the community by sanctioning traditional man–woman family units and procreation."

1. **Marriage is a state–conferred legal partnership status, the existence of which gives rise to a multiplicity of rights and benefits reserved exclusively to that particular relation.**

The power to regulate marriage is a sovereign function reserved exclusively to the respective states. ***Salisbury v. List***, 501 F. Supp. 105, 107 (D. Nev. 1980); *see* ***O'Neill v. Dent***, 364 F. Supp. 565 (E.D.N.Y. 1973). By its very nature, the power to regulate the marriage relation includes the power to determine the requisites of a valid marriage contract and to control the qualifications of the contracting parties, the forms and procedures necessary to solemnize the marriage, the duties and obligations it creates, its effect upon property and other rights, and the

---

[17] For the reasons stated, *infra*, in this opinion, it is irrelevant, for purposes of the constitutional analysis germane to this case, whether homosexuals constitute a "suspect class" because it is immaterial whether the plaintiffs, or any of them, are homosexuals. *See supra* note 14.

grounds for marital dissolution. *Id.*; *see also Maynard v. Hill, supra.*

In other words, marriage is a state–conferred legal status, the existence of which gives rise to rights and benefits reserved exclusively to that particular relationship. This court construes marriage as " 'a partnership to which both partners bring their financial resources as well as their individual energies and efforts.' " *Gussin v. Gussin*, 73 Haw. 470, 483, 836 P.2d 484, 491 (1992) (citation omitted); *Myers v. Myers*, 70 Haw. 143, 154, 764 P.2d 1237, 1244, *reconsideration denied*, 70 Haw. 661, 796 P.2d 1004 (1988); *Cassiday v. Cassiday*, 68 Haw. 383, 387, 716 P.2d 1133, 1136 (1986). So zealously has this court guarded the state's role as the exclusive progenitor of the marital partnership that it declared, over seventy years ago, that "common law" marriages — *i.e.*, "marital" unions existing in the absence of a state–issued license and not performed by a person or society possessing governmental authority to solemnize marriages — would no longer be recognized in the Territory of Hawaii. *Parke v. Parke*, 25 Haw. 397, 404–05 (1920).[18]

---

[18] In *Parke*, a "common law" petitioner sought unsuccessfully to derive the benefits of inheritance rights unique to a married spouse, apparently having affirmatively chosen not to seek the state–conferred status of a lawful marriage "partner." *Id.* at 398, 405. A "same sex spouse" suffered the identical fate in *De Santo v. Barnsley*, 328 Pa. Super. 181, 476 A.2d 952 (1984) (two persons of same sex cannot contract common law marriage, notwithstanding state's recognition of common law marriage between persons of different sex), a decision on which Lewin relies in his answering brief. It is ironic that, in arguing before the circuit court that Hawaii's marriage laws do not "burden, penalize, infringe, or interfere in any way with the [plaintiffs'] private relationships" and in urging before this court that their "relationships are not disturbed in any manner by" HRS § 572–1, Lewin implicitly suggests that the applicant couples should be content with a *de facto* status

Indeed, the state's monopoly on the business of marriage creation has been codified by statute for more than a century. HRS § 572–1(7), descended from an 1872 statute of the Hawaiian Kingdom, conditions a valid marriage contract on "[t]he marriage ceremony be[ing] performed in the State by a person or society with a valid license to solemnize marriages[.]" HRS § 572–11 (1985) accords the DOH sole authority to grant licenses to solemnize marriages, and HRS § 572–12 (1985) restricts the issuance of such licenses to clergy, representatives of religious societies (such as the Society of Friends) not having clergy but providing solemnization by custom, and judicial officers. Finally, HRS §§ 572–5 and 572–6 vest the DOH with exclusive authority to issue licenses to marriage applicants and to ensure that the general requisites and procedures prescribed by HRS chapter 572 are satisfied.

The applicant couples correctly contend that the DOH's refusal to allow them to marry on the basis that they are members of the same sex deprives them of access to a multiplicity of rights and benefits that are contingent upon that status. Although it is unnecessary in this opinion to engage in an encyclopedic recitation of all of them, a number of the most salient marital rights and benefits are worthy of note. They include: (1) a variety of state income tax advantages, including deductions, credits, rates, exemptions, and estimates, under HRS chapter 235 (1985 and Supp. 1992); (2) public assistance from and exemptions relating to the Department of Human Services under HRS chapter 346 (1985 and Supp. 1992); (3) control, division, acquisition, and disposition of com-

---

that the state declines to acknowledge *de jure* and that lacks the statutory rights and benefits of marriage. *See infra* at 560–62.

munity property under HRS chapter 510 (1985); (4) rights relating to dower, curtesy, and inheritance under HRS chapter 533 (1985 and Supp. 1992); (5) rights to notice, protection, benefits, and inheritance under the Uniform Probate Code, HRS chapter 560 (1985 and Supp. 1992); (6) award of child custody and support payments in divorce proceedings under HRS chapter 571 (1985 and Supp. 1992); (7) the right to spousal support pursuant to HRS § 572–24 (1985); (8) the right to enter into premarital agreements under HRS chapter 572D (Supp. 1992); (9) the right to change of name pursuant to HRS § 574–5(a)(3) (Supp. 1992); (10) the right to file a nonsupport action under HRS chapter 575 (1985 and Supp. 1992); (11) post–divorce rights relating to support and property division under HRS chapter 580 (1985 and Supp. 1992); (12) the benefit of the spousal privilege and confidential marital communications pursuant to Rule 505 of the Hawaii Rules of Evidence (1985); (13) the benefit of the exemption of real property from attachment or execution under HRS chapter 651 (1985); and (14) the right to bring a wrongful death action under HRS chapter 663 (1985 and Supp. 1992). For present purposes, it is not disputed that the applicant couples would be entitled to all of these marital rights and benefits, but for the fact that they are denied access to the state–conferred legal status of marriage.

> 2. **HRS § 572–1, on its face, discriminates based on sex against the applicant couples in the exercise of the civil right of marriage, thereby implicating the equal protection clause of article I, section 5 of the Hawaii Constitution.**

Notwithstanding the state's acknowledged steward-ship over the institution of marriage, the extent of per-

missible state regulation of the right of access to the marital relationship is subject to constitutional limitations or constraints. *See, e.g.*, *Zablocki*, 435 U.S. at 388–91, 98 S. Ct. at 682–83; *Loving v. Virginia*, 388 U.S. 1, 7–12, 87 S. Ct. 1817, 1821–24, 18 L. Ed. 2d 1010 (1967); *Salisbury*, 501 F. Supp. at 107 (citing *Johnson v. Rockefeller*, 58 F.R.D. 42 (S.D.N.Y. 1972)). It has been held that a state may deny the right to marry only for compelling reasons. *Salisbury*, 501 F. Supp. at 107; *Johnson, supra.*[19]

The equal protection clauses of the United States and Hawaii Constitutions are not mirror images of one another. The fourteenth amendment to the United States Constitution somewhat concisely provides, in relevant part, that a state may not "deny *to any person within its jurisdiction the equal protection of the laws.*" Hawaii's counterpart is more elaborate. Article I, section 5 of the Hawaii Constitution provides in relevant part that "[n]o person shall . . . be denied the equal protection of the laws, *nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of* race, religion, *sex*, or ancestry." (Emphasis added.) Thus, by its plain language, the Hawaii Constitution prohibits state–sanctioned discrimination against any person in the exercise of his or her civil rights on the basis of sex.

"The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly

---

[19] For example, states, including Hawaii, may and do prohibit marriage for such "compelling" reasons as consanguinity (to prevent incest), *see, e.g.*, HRS § 572–1(1), immature age (to protect the welfare of children), *see, e.g.*, HRS §§ 572–1(2) and 572–2 (1985), presence of venereal disease (to foster public health), *see, e.g.*, HRS § 572–1(5), and to prevent bigamy, *see, e.g.*, HRS § 572–1(3). *See also Zablocki*, 434 U.S. at 392, 98 S. Ct. at 684 (concurring opinion of Stewart, J.); *Salisbury*, 501 F. Supp. at 107.

pursuit of happiness by free [people]." ***Loving***, 388 U.S. at 12, 87 S. Ct. at 1824. So "fundamental" does the United States Supreme Court consider the institution of marriage that it has deemed marriage to be "one of the 'basic civil rights of [men and women.]' " *Id.* (quoting ***Skinner***, 316 U.S. at 541, 62 S. Ct. at 1113).

Black's Law Dictionary (6th ed. 1990) defines "civil rights" as synonymous with "civil liberties." *Id.* at 246. "Civil liberties" are defined, *inter alia*, as "[p]ersonal, natural rights guaranteed and protected by Constitution; *e.g.*, . . . freedom from discrimination . . . . Body of law dealing with natural liberties . . . which invade equal rights of others. Constitutionally, they are restraints on government." *Id.* This court has held, in another context, that such "privilege[s] of citizenship . . . cannot be taken away [on] any of the prohibited bases of race, religion, *sex* or ancestry" enumerated in article I, section 5 of the Hawaii Constitution and that to do so violates the right to equal protection of the laws as guaranteed by that constitutional provision. ***State v. Levinson***, 71 Haw. 492, 499, 795 P.2d 845, 849–50 (1990) (exclusion of female jurors solely because of their sex denies them equal protection under Hawaii Constitution) (emphasis added).

Rudimentary principles of statutory construction render manifest the fact that, by its plain language, HRS § 572–1 restricts the marital relation to a male and a female. " '[T]he fundamental starting point for statutory interpretation is the language of the statute itself. . . . [W]here the statutory language is plain and unambiguous,' " we construe it according " 'to its plain and obvious meaning.' " ***Schmidt v. Board of Directors of Ass'n of Apartment Owners of The Marco Polo Apartments***, 73 Haw. 526, 531–32, 836 P.2d 479, 482 (1992); ***In re Tax Appeal of Lower Mapunapuna Tenants Ass'n***,

73 Haw. 63, 68, 828 P.2d 263, 266 (1992). The non–consanguinity requisite contained in HRS § 572–1(1) precludes marriages, *inter alia*, between "brother and sister," "uncle and niece," and "aunt and nephew[.]" The anti–bigamy requisite contained in HRS § 572–1(3) forbids a marriage between a "man" or a "woman" as the case may be, who, at the time, has a living and "lawful wife . . . [or] husband[.]" And the requisite, set forth in HRS § 572–1(7), requiring marriage ceremonies to be performed by state–licensed persons or entities expressly speaks in terms of "the man and woman to be married[.]"[20] Accordingly, on its face and (as Lewin admits) as applied, HRS § 572–1 denies same–sex couples access to the marital status and its concomitant rights and benefits. It is the state's regulation of access to the status of married persons, on the basis of the applicants' sex, that gives rise to the question whether the applicant couples have been denied the equal protection of the laws in violation of article I, section 5 of the Hawaii Constitution.

Relying primarily on four decisions construing the law of other jurisdictions,[21] Lewin contends that "the fact that

---

[20] That the legislature, in enacting HRS ch. 572, obviously contemplated marriages between persons of the opposite sex is not, however, outcome dispositive of the plaintiffs' claim. Legislative action, whatever its motivation, cannot sanitize constitutional violations. *Cf. **City of Cleburne v. Cleburne Living Center, Inc.***, 473 U.S. 432, 448, 105 S. Ct. 3249, 3259, 87 L. Ed. 2d 313 (1985) ("It is plain that the electorate as a whole, whether by referendum or otherwise, could not order . . . action violative of the Equal Protection Clause.")

[21] The four decisions are ***Jones v. Hallahan***, 501 S.W.2d 588 (Ky. Ct. App. 1973); ***Baker v. Nelson***, 291 Minn. 310, 191 N.W.2d 185 (1971), *appeal dismissed*, 409 U.S. 810, 93 S. Ct. 37, 34 L. Ed. 2d 65 (1972); *De Santo v. Barnsley, supra*; and ***Singer v. Hara***, 11 Wash. App. 247, 522 P.2d 1187, *review denied*, 84 Wash. 2d 1008 (1974).

homosexual [sic — actually, same–sex][22] partners cannot form a state–licensed marriage is not the product of impermissible discrimination" implicating equal protection considerations, but rather "a function of their biologic inability as a couple to satisfy the definition of the status to which they aspire." Lewin's answering brief at 21. Put differently, Lewin proposes that "the right of persons of the same sex to marry one another does not exist because marriage, by definition and usage, means a special relationship between a man and a woman." *Id.* at 7. We believe Lewin's argument to be circular and unpersuasive.

Two of the decisions upon which Lewin relies are demonstrably inapposite to the appellant couples' claim. In *Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185 (1971), *appeal dismissed*, 409 U.S. 810, 93 S. Ct. 37, 34 L. Ed. 2d 65 (1972), the questions for decision were whether a marriage of two persons of the same sex was authorized by state statutes and, if not, whether state authorization was compelled by various provisions of the United States Constitution, including the fourteenth amendment. Regarding the first question, the *Baker* court arrived at the same conclusion as have we with respect to HRS § 572–1: by their plain language, the Minnesota marriage statutes precluded same–sex marriages. Regarding the second question, however, the court merely held that the United States Constitution was not offended; apparently, no state constitutional questions were raised and none were addressed.

*De Santo v. Barnsley*, 328 Pa. Super. 181, 476 A.2d 952 (1984), is also distinguishable. In *De Santo*, the court

---

[22] *See supra* note 11.

held only that common law same–sex marriage did not exist in Pennsylvania, a result irrelevant to the present case. The appellants sought to assert that denial of same–sex common law marriages violated the state's equal rights amendment, but the appellate court expressly declined to reach the issue because it had not been raised in the trial court.

*Jones v. Hallahan*, 501 S.W.2d 588 (Ky. Ct. App. 1973), and *Singer v. Hara*, 11 Wash. App. 247, 522 P.2d 1187, *review denied*, 84 Wash. 2d 1008 (1974), warrant more in–depth analysis. In *Jones*, the appellants, both females, sought review of a judgment that held that they were not entitled to have a marriage license issued to them, contending that refusal to issue the license deprived them of the basic constitutional rights to marry, associate, and exercise religion freely. In an opinion acknowledged to be "a case of first impression in Kentucky," the Court of Appeals summarily affirmed, ruling as follows:

> Marriage was a custom long before the state commenced to issue licenses for that purpose. . . . [M]arriage has always been considered as a union of a man and a woman . . . .
>
> It appears to us that appellants are prevented from marrying, not by the statutes of Kentucky or the refusal of the County Clerk . . . to issue them a license, but rather by their own incapability of entering into a marriage as that term is defined.
>
> . . . .
>
> In substance, the relationship proposed by the appellants does not authorize the issuance of a marriage license because what they propose is not a marriage.

501 S.W.2d at 589–90.

Significantly, the appellants' equal protection rights — federal or state — were not asserted in *Jones*, and, accordingly, the appeals court was relieved of the necessity of addressing and attempting to distinguish the decision of the United States Supreme Court in *Loving*. *Loving* involved the appeal of a black woman and a caucasian man (the Lovings) who were married in the District of Columbia and thereafter returned to their home state of Virginia to establish their marital abode. 388 U.S. at 2, 87 S. Ct. at 1819. The Lovings were duly indicted for and convicted of violating Virginia's miscegenation laws,[23] which banned interracial marriages. *Id.*[24] In his sentencing decision, the trial judge stated, in substance, that Divine Providence had not intended that the marriage state extend to interracial unions:

> "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows that *he did not intend for the races to mix.*"

*Id.* at 3, 87 S. Ct. at 1819 (quoting the trial judge) (emphasis added).

---

[23] Virginia's miscegenation laws "arose as an incident to slavery and [were] common . . . since the colonial period." 388 U.S. at 6, 87 S. Ct. at 1820–21. It is noteworthy that one of the "central provisions" of the statutory miscegenation scheme *automatically voided* all marriages between "a white person and a colored person" without the need for any judicial proceeding. *Id.* at 4, 87 S. Ct. at 1820.

[24] As of 1949, the following thirty of the forty–eight states banned interracial marriages by statute: Alabama; Arizona; Arkansas; California; Colorado; Delaware; Florida; Georgia; Idaho; Indiana; Kentucky; Louisiana; Maryland; Mississippi; Missouri; Montana; Nebraska;

The Lovings appealed the constitutionality of the state's miscegenation laws to the Virginia Supreme Court of Appeals, which, *inter alia*, upheld their constitutionality and affirmed the Lovings' convictions. *Id.* at 3–4, 388 S. Ct. at 1819.[25] The Lovings then pressed their appeal to the United States Supreme Court. *Id.*

In a landmark decision, the United States Supreme Court, through Chief Justice Warren, struck down the Virginia miscegenation laws on both equal protection and due process grounds. The court's holding as to the former is pertinent for present purposes:

> [T]he Equal Protection Clause requires the consideration of whether the classifications drawn by any statute constitute an arbitrary and invidious discrimination. . . .

Nevada; North Carolina; North Dakota; Oklahoma; Oregon; South Carolina; South Dakota; Tennessee; Texas; Utah; Virginia; West Virginia; and Wyoming. 388 U.S. at 6 n.5, 87 S. Ct. at 1820 n.5. When the Lovings commenced their lawsuit on October 28, 1964, sixteen states still had miscegenation laws on the books. *Id.* at 3, 6 n.5, 87 S. Ct. at 1819, 1820 n.5. The first state court to recognize that miscegenation statutes violated the right to the equal protection of the laws was the Supreme Court of California in *Perez v. Sharp*, 32 Cal. 2d 711, 198 P.2d 17 (1948). 388 U.S. at 6 n.5, 87 S. Ct. at 1820–21 n.5.

[25] See *Loving v. Commonwealth*, 206 Va. 924, 147 S.E.2d 78 (1966). The Virginia Supreme Court of Appeals, however, modified as "so unreasonable as to render the sentences void" the trial court's twenty–five year suspension of the Lovings' jail sentences "upon the condition that they leave the . . . state 'at once and . . . not return together or at the same time to [the] . . . state for a period of twenty–five years.'" *Id.* at 930, 147 S.E.2d at 82–83. The Virginia high court deemed it sufficient that the Lovings be prohibited from "again cohabit[ing] as man and wife in [the] state" in order to achieve the objectives of "securing the rehabilitation of the offender[s and] enabling [them] to repent and reform so that [they] may be restored to a useful place in society." *Id.* at 930, 147 S.E.2d at 83.

There can be no question but that Virginia's miscegenation statutes rest solely upon distinctions drawn according to race. *The statutes proscribe generally accepted conduct* if engaged in by members of different races. . . . At the very least, the Equal Protection Clause demands that racial classifications . . . be subjected to the "most rigid scrutiny," . . . and, if they are ever to be upheld, *they must be shown to be necessary to the accomplishment of some permissible state objective, independent of the* racial *discrimination which it was the object of the Fourteenth Amendment to eliminate.* . . .

There is patently no legitimate overriding purpose independent of invidious discrimination which justifies this classification. . . . We have consistently denied the constitutionality of measures which restrict the rights of citizens on account of race. There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause.

*Id.* at 10–12, 87 S. Ct. at 1823 (emphasis added and citation omitted).[26]

The facts in *Loving* and the respective reasoning of the Virginia courts, on the one hand, and the United States Supreme Court, on the other, both discredit the reasoning of *Jones* and unmask the tautological and

---

[26] As we have noted in this opinion, unlike the equal protection clause of the fourteenth amendment to the United States Constitution, article I, section 5 of the Hawaii Constitution, *inter alia*, expressly prohibits discrimination against persons in the exercise of their civil rights on the basis of sex.

circular nature of Lewin's argument that HRS § 572–1 does not implicate article I, section 5 of the Hawaii Constitution because same sex marriage is an innate impossibility. Analogously to Lewin's argument and the rationale of the *Jones* court, the Virginia courts declared that interracial marriage simply could not exist because the Deity had deemed such a union intrinsically unnatural, 388 U.S. at 3, 87 S. Ct. at 1819, and, in effect, because it had theretofore never been the "custom" of the state to recognize mixed marriages, marriage "always" having been construed to presuppose a different configuration. With all due respect to the Virginia courts of a bygone era, we do not believe that trial judges are the ultimate authorities on the subject of Divine Will, and, as *Loving* amply demonstrates, constitutional law may mandate, like it or not, that customs change with an evolving social order.

*Singer v. Hara*, 11 Wash. App. 247, 522 P.2d 1187, *review denied*, 84 Wash. 2d 1008 (1974), suffers the same fate as does *Jones*. In *Singer*, two males appealed from a trial court's order denying their motion to show cause by which they sought to compel the county auditor to issue them a marriage license. On appeal, the unsuccessful applicants argued that: (1) the trial court erred in concluding that the Washington state marriage laws prohibited same–sex marriages; (2) the trial court's order violated the equal rights amendment to the state constitution; and (3) the trial court's order violated various provisions of the United States Constitution, including the fourteenth amendment.

The Washington Court of Appeals affirmed the trial court's order, rejecting all three of the appellants' contentions. Predictably, and for the same reasons that we have reached the identical conclusion regarding HRS § 572–1, the *Singer* court determined that it was "apparent from a

plain reading of our marriage statutes that the legislature has not authorized same–sex marriages." *Id.* at 249, 522 P.2d at 1189. Regarding the appellants' federal and state claims, the court specifically "[did] not take exception to the proposition that *the Equal Protection Clause of the Fourteenth Amendment requires strict judicial scrutiny of legislative attempts at sexual discrimination." Id.* at 261, 522 P.2d at 1196 (emphasis added).[27] Nevertheless, the *Singer* court found no defect in the state's marriage laws, under either the United States Constitution or the state constitution's equal rights amendment, based upon the rationale of *Jones*: "[a]ppellants were not denied a marriage license because of their sex; rather, they were denied a marriage license because of the nature of marriage itself." *Id.* As in *Jones*, we reject this exercise in tortured and conclusory sophistry.

### 3. Equal Protection Analysis under Article I, Section 5 of the Hawaii Constitution

"Whenever a denial of equal protection of the laws is alleged, as a rule our initial inquiry has been whether the legislation in question should be subjected to 'strict scrutiny' or to a 'rational basis' test." **Nakano v. Matayoshi**, 68 Haw. 140, 151, 706 P.2d 814, 821 (1985) (citing **Nagle v. Board of Educ.**, 63 Haw. 389, 392, 629 P.2d 109, 111 (1981)). This court has applied "strict scrutiny" analysis to " 'laws classifying on the basis of suspect categories or impinging upon fundamental rights expressly or impliedly granted by the [c]onstitution,' " in which case

---

[27] Accordingly, but for the fact that the *Singer* court was unable to discern sexual discrimination in the state's marriage laws, it would have engaged in a "strict scrutiny" analysis. *See infra* at 571–72.

the laws are " 'presumed to be unconstitutional[28] unless the state shows compelling state interests which justify such classifications,' " *Holdman v. Olim*, 59 Haw. 346, 349, 581 P.2d 1164, 1167 (1978) (citing *Nelson v. Miwa*, 56 Haw. 601, 605 n.4, 546 P.2d 1005, 1008 n.4 (1976)), and that the laws are "narrowly drawn to avoid unnecessary abridgments of constitutional rights." *Nagle*, 63 Haw. at 392, 629 P.2d at 111 (citations omitted).

By contrast, "[w]here 'suspect' classifications or fundamental rights are not at issue, this court has traditionally employed the rational basis test." *Id.* at 393, 629 P.2d at 112. "Under the rational basis test, we inquire as to whether a statute rationally furthers a legitimate state interest." *Estate of Coates v. Pacific Engineering*, 71 Haw. 358, 364, 791 P.2d 1257, 1260 (1990). "Our inquiry seeks only to determine whether any reasonable justification can be found for the legislative enactment." *Id.*

As we have indicated, HRS § 572–1, on its face and as applied, regulates access to the marital status and its concomitant rights and benefits on the basis of the applicants' sex. *See supra* at 563–64. As such, HRS § 572–1 establishes a sex–based classification.

HRS § 572–1 is not the first sex–based classification with which this court has been confronted. In *Holdman v. Olim, supra,* a woman prison visitor (Holdman) brought an action against prison officials seeking injunctive,

---

[28] The presumption of statutory constitutionality, to which Judge Heen refers at 595 of his dissenting opinion, does not apply to laws, which, on their face, classify on the basis of suspect categories. *Washington v. Fireman's Fund Ins. Cos.*, 68 Haw. 192, 199, 708 P.2d 129, 134 (1985), *cert. denied*, 476 U.S. 1169, 106 S. Ct. 2890, 90 L. Ed. 2d 977 (1986), on which the dissent relies, is not authority to the contrary inasmuch as the statute in question did not involve any suspect categories and was reviewed under the "rational basis" standard.

monetary, and declaratory relief arising from a prison matron's refusal to admit Holdman entry when she was not wearing a brassiere. The matron's refusal derived from a directive, promulgated by the Acting Prison Administrator, that "visitors will be properly dressed. *Women* visitors are asked to be fully clothed, including undergarments. Provocative attire is discouraged." 59 Haw. at 347–48, 581 P.2d at 1166 (emphasis added). Holdman proceeded to trial, and the circuit court dismissed her action at the close of her case in chief. *Id.* at 347, 581 P.2d at 1165–66.

On appeal, this court affirmed the dismissal of Holdman's complaint. The significance of *Holdman* for present purposes, however, is the rationale by which this court reached its result:

> This court has not [heretofore] dealt with a sex–based classification. In *Frontiero v. Richardson*, 411 U.S. 677, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973), a plurality of the United States Supreme Court favored the inclusion of classifications based upon sex among those considered to be suspect for the purposes of the compelling state interest test. However, subsequent cases have made it clear that the current governing test under the Fourteenth Amendment [to the United States Constitution] is a standard intermediate between rational basis and strict scrutiny. "[C]lassifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197[, 97 S. Ct. 451, 457, 50 L. Ed. 2d 397] (1976). *Also see Califano v. Goldfarb*, 430 U.S. 199, 2[10 n.8, 97 S. Ct. 1021, 1028, n.8, 51 L. Ed. 2d 270] (1977) and *Califano*

*v. Webster*, 430 U.S. 313, 316–17[, 97 S. Ct. 1192, 1194, 51 L. Ed. 2d 360] (1977).

. . . .

Dress standards are intimately related to sexual attitudes. . . . The dress restrictions imposed upon women visitors by the directive derived their relation to prison security out of the assumption that these attitudes were present among the residents. Whether or not this assumption was correct, it is manifest that the directive was substantially related to the achievement of the important governmental objective of prison security and met the test under the Fourteenth Amendment.

. . . .

[Holdman's] challenge to the directive under the state constitution requires separate consideration. Article I, Section 4[29] of the Hawaii Constitution declares that no person shall be "denied the equal protection of the laws, nor be denied the enjoyment of [the person's] civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry." Article I, Section 21[30] provides: "Equality of rights under the law shall not be denied or abridged by the State on account of sex." We are presented with two questions, either of which might be dispositive of the present case. We must first inquire whether the treatment [Holdman] received denied to her the equal protection of the laws

---

[29] In 1978, article I, section 4 was renumbered article I, section 5.

[30] In 1978, article I, section 21 was renumbered article I, section 3.

guaranteed by the Hawaii Constitution under a more stringent test than that applicable under the Fourteenth Amendment. If the more general guarantee of equal protection does not sustain [Holdman's] claims, we must then inquire whether the specific guarantee of equality of rights under the law contained in Article I, Section 21, has been infringed.

*It is open to this court, of course, to apply the more stringent test of compelling state interest to sex–based classifications in assessing their validity under the equal protection clause of the state constitution.* **State v. Kaluna**, 55 Haw. 361, 520 P.2d 51 (1974). [Holdman] urges that we do so, arguing both from *Frontiero v. Richardson, supra,* and from the presence of sex with race, religion and ancestry as a category specifically named in Article I, Section 4.

*We need not deal finally with that issue, and reserve it for future consideration, since we conclude that the compelling state interest test would be satisfied in this case if it were to be held applicable. . . .*

. . . .

*Survival under the strict scrutiny test places the directive beyond [Holdman's] challenge under her asserted . . . right to equal protection . . . .* It does not necessarily place the directive beyond challenge under the equal rights provision of Article I, Section 21.

Article I, Section 21, is substantially identical with the proposed Equal Rights Amendment of the United States Constitution. . . . The standard

of review to be applied under an ERA has not been clearly formulated by judicial decision. . . .

. . . Unless we are to attempt in this case to define the standard of review required under Hawaii's ERA, no purpose will be served by analysis of the considerable body of decisions which fall short of dealing with that question. . . . *We have concluded that the treatment of which [Holdman] complains withstands the test of strict scrutiny by reason of a compelling State interest.* We are not prepared to hold in this case that . . . . a more stringent test should be applied under Article I, Section 21 . . . .

*Id.* at 349–54, 581 P.2d at 1167–69 (emphasis added and citations and footnote omitted).

Our decision in *Holdman* is key to the present case in several respects. First, we clearly and unequivocally established, for purposes of equal protection analysis under the Hawaii Constitution, that sex–based classifications are subject, as a *per se* matter, to some form of "heightened" scrutiny, be it "strict" or "intermediate," rather than mere "rational basis" analysis.[31] Second, we assumed, *arguendo*, that such sex–based classifications were subject to "strict scrutiny." Third, we reaffirmed the longstanding principle that this court is free to accord greater protections to Hawaii's citizens under the state constitution than are recognized under the United States

---

[31] In subsequent decisions, we have reaffirmed that sex–based classifications are subject, at the very least, to "intermediate scrutiny" under the equal protection clause of the Hawaii Constitution. *State v. Tookes*, 67 Haw. 608, 614, 699 P.2d 983, 988 (1985); *State v. Rivera*, 62 Haw. 120, 123, 612 P.2d 526, 529 (1980).

Constitution.[32] And fourth, we looked to the *then current* case law of the United States Supreme Court for guidance.

Of the decisions of the United States Supreme Court cited in *Holdman*, *Frontiero v. Richardson*, *supra*, was by far the most significant. In *Frontiero*, a married woman air force officer and her husband (the Frontieros) filed suit against the Secretary of Defense seeking declaratory and injunctive relief against enforcement of federal statutes governing quarters allowances and medical benefits for members of the uniformed services. The statutes provided, solely for administrative convenience, that spouses of male members were unconditionally considered dependents for purposes of obtaining such allowances and benefits, but that spouses of female members were not considered dependents unless they were in fact dependent for more than one–half of their support. The Frontieros' lawsuit was precipitated by the husband's inability to satisfy the statutory dependency standard. A three–judge district court panel denied the Frontieros' claim for relief, and they appealed.

---

[32] *See, e.g.*, *State v. Texeira*, 50 Haw. 138, 142 n.2, 433 P.2d 593, 597 n.2 (1967); *State v. Grahovac*, 52 Haw. 527, 531, 533, 480 P.2d 148, 151–52 (1971); *State v. Santiago*, 53 Haw. 254, 265–66, 492 P.2d 657, 664 (1971); *State v. Kaluna*, 55 Haw. 361, 367–69, 372–75, 520 P.2d 51, 57–58, 60–62 (1974); *State v. Manzo*, 58 Haw. 440, 452, 573 P.2d 945, 953 (1977); *State v. Miyasaki*, 62 Haw. 269, 280–82, 614 P.2d 915, 921–23 (1980); *Huihui v. Shimoda*, 64 Haw. 527, 531, 644 P.2d 968, 971 (1982); *State v. Fields*, 67 Haw. 268, 282, 686 P.2d 1379, 1390 (1984); *State v. Wyatt*, 67 Haw. 293, 304 n.9, 687 P.2d 544, 552 n.9 (1984); *State v. Tanaka*, 67 Haw. 658, 661–62, 701 P.2d 1274, 1276 (1985); *State v. Kim*, 68 Haw. 286, 289–90, 711 P.2d 1291, 1293–94 (1985); *State v. Kam*, 69 Haw. 483, 491, 748 P.2d 372, 377 (1988); *State v. Quino*, 74 Haw. 161, 164 n.2, 840 P.2d 358, 364 n.2 (1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1849, 123 L. Ed. 2d 472 (1993) (Levinson, J., concurring).

Noting that "[u]nder these statutes, a serviceman may claim his wife as a 'dependent' without regard to whether she is in fact dependent upon him for any part of her support[,]" but that "[a] servicewoman . . . may not claim her husband as a 'dependent' . . . unless he is in fact dependent upon her for over one–half of his support[,]" a plurality of four, through Justice Brennan (the Brennan plurality), framed the issue on appeal as "whether this difference in treatment constitutes an unconstitutional discrimination against servicewomen . . . ." 411 U.S. at 678–79, 93 S. Ct. at 1766. By an eight–to–one majority, the court concluded that the statutes established impermissibly differential treatment between men and women and, accordingly, reversed the judgment of the district court.

The disagreement among the eight–justice majority lay in the level of judicial scrutiny applicable to instances of statutory sex–based discrimination. The Brennan plurality agreed with the Frontieros' contention that "classifications based upon sex, like classifications based upon race, alienage, and national origin, are inherently suspect and must therefore be subjected to close judicial scrutiny." *Id.* at 682, 93 S. Ct. at 1768 (footnotes omitted). Thus, the Brennan plurality applied the "strict scrutiny" standard to its review of the illegal statutes. Justice Stewart concurred in the judgment, "agreeing that the statutes . . . work[ed] an invidious discrimination in violation of the Constitution." *Id.* at 691, 93 S. Ct. at 1772–73.

Particularly noteworthy in *Frontiero,* however, was the concurring opinion of Justice Powell, joined by the Chief Justice and Justice Blackmun (the Powell group). The Powell group agreed that "the challenged statutes constitute[d] an unconstitutional discrimination against servicewomen," but deemed it "unnecessary for the Court

*in this case* to characterize sex as a suspect classification, with all of the far–reaching implications of such a holding." *Id.* at 691–92, 93 S. Ct. at 1773 (emphasis added and citation omitted). Central to the Powell group's thinking was the following explanation:

> There is another . . . reason for deferring a general categorizing of sex classifications as invoking the strictest test of judicial scrutiny. *The Equal Rights Amendment, which if adopted will resolve the substance of this precise question*, has been approved by the Congress and submitted for ratification by the States. If this Amendment is duly adopted, it will represent the will of the people accomplished in the manner prescribed by the Constitution. By acting prematurely and unnecessarily, . . . the Court has assumed a decisional responsibility at the very time when state legislatures, functioning within the traditional democratic process, are debating the proposed Amendment. It seems . . . that this reaching out to pre–empt by judicial action a major political decision which is currently in process of resolution does not reflect appropriate respect for duly prescribed legislative processes.

*Id.* at 692, 93 S. Ct. at 1773 (emphasis added).

The Powell group's concurring opinion therefore permits but one inference: had the Equal Rights Amendment been incorporated into the United States Constitution, at least seven members (and probably eight) of the *Frontiero* court would have subjected statutory sex–based classifications to "strict" judicial scrutiny.

In light of the interrelationship between the reasoning of the Brennan plurality and the Powell group in

*Frontiero*, on the one hand, and the presence of article I, section 3 — the Equal Rights Amendment — in the Hawaii Constitution, on the other, it is time to resolve once and for all the question left dangling in *Holdman*. Accordingly, we hold that sex is a "suspect category" for purposes of equal protection analysis under article I, section 5 of the Hawaii Constitution[33] and that HRS § 572–1 is subject to the "strict scrutiny" test. It therefore follows, and we so hold, that (1) HRS § 572–1 is presumed to be unconstitutional (2) unless Lewin, as an agent of the State of Hawaii, can show that (a) the statute's sex–based classification is justified by compelling state interests and (b) the statute is narrowly drawn to avoid unnecessary abridgments of the applicant couples' constitutional rights.

4.   **The dissenting opinion misconstrues the holdings and reasoning of the plurality.**

We would be remiss if we did not address certain basic misconstructions of this opinion appearing in Judge Heen's dissent. First, we have *not* held, as Judge Heen seems to imply, that (1) the appellants "have a 'civil right' to a same sex marriage[,]" (2) "the civil right to marriage must be accorded to same sex couples[,]" and (3) the applicant couples "have a right to a same sex marriage[.]" Dissenting opinion at 588–89. These conclusions would be premature. We have, however, noted that the United States Supreme Court has recognized for over fifty years that marriage is a basic civil right. *See supra* at 562–64. That proposition is relevant to the prohibition set forth in article I, section 5 of the Hawaii Constitution against

---

[33] Our holding in this regard is *not*, as the dissent suggests, "[t]hat Appellants are a 'suspect class.'" Dissenting opinion at 592.

discrimination in the exercise of a person's civil rights, *inter alia*, on the basis of sex. *See id.* at 562.

Second, we have *not* held, as Judge Heen also seems to imply, that HRS § 572–1 "unconstitutionally discriminates against [the applicant couples] who seek a license to enter into a same sex marriage[.]" Dissenting opinion at 588. Such a holding would likewise be premature at this time. What we *have* held is that, on its face and as applied, HRS § 572–1 denies same–sex couples access to the marital status and its concomitant rights and benefits, thus implicating the equal protection clause of article I, section 5. *See supra* at 564.

We understand that Judge Heen disagrees with our view in this regard based on his belief that "HRS § 572–1 treats everyone alike and applies equally to both sexes[,]" with the result that "[n]either sex is being *granted* a right or benefit the other does not have, and neither sex is being *denied* a right or benefit that the other has." Dissenting opinion at 590–91 (emphasis in original). The rationale underlying Judge Heen's belief, however, was expressly considered and rejected in *Loving*:

> Thus, the State contends that, because its miscegenation statutes punish equally both the white and the Negro participants in an interracial marriage, these statutes, despite their reliance on racial classifications do not constitute an invidious discrimination based upon race. . . . [W]e reject the notion that the mere "equal application" of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscriptions of all invidious discriminations . . . . In the case at bar, . . . we deal with statutes containing racial classifications, and the fact of equal application

does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race.

388 U.S. at 8, 87 S. Ct. at 1821–22. Substitution of "sex" for "race" and article I, section 5 for the fourteenth amendment yields the precise case before us together with the conclusion that we have reached.

As a final matter, we are compelled to respond to Judge Heen's suggestion that denying the appellants access to the multitude of statutory benefits "conferred upon spouses in a legal marriage . . . is a matter for the legislature, which can express the will of the populace in deciding whether such benefits should be extended to persons in [the applicant couples'] circumstances." Dissenting opinion at 597. In effect, we are being accused of engaging in judicial legislation. We are not. The result we reach today is in complete harmony with the *Loving* court's observation that any state's powers to regulate marriage are subject to the constraints imposed by the constitutional right to the equal protection of the laws. 388 U.S. at 7, 87 S. Ct. at 1821. If it should ultimately be determined that the marriage laws of Hawaii impermissibly discriminate against the appellants, based on the suspect category of sex, then that would be the result of the interrelation of existing legislation.

[W]hether the legislation under review is wise or unwise is a matter with which we have nothing to do. Whether it . . . work[s] well or work[s] ill presents a question entirely irrelevant to the issue. The only legitimate inquiry we can make is whether it is constitutional. If it is not, its virtues, if it have any, cannot save it; if it is, its faults cannot be invoked to accomplish its

destruction. If the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned.

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483, 54 S. Ct. 231, 256, 78 L. Ed. 413 (1934) (Sutherland, J., dissenting).

## III. CONCLUSION

Because, for the reasons stated in this opinion, the circuit court erroneously granted Lewin's motion for judgment on the pleadings and dismissed the plaintiffs' complaint, we vacate the circuit court's order and judgment and remand this matter for further proceedings consistent with this opinion. On remand, in accordance with the "strict scrutiny" standard, the burden will rest on Lewin to overcome the presumption that HRS § 572–1 is unconstitutional by demonstrating that it furthers compelling state interests and is narrowly drawn to avoid unnecessary abridgments of constitutional rights. *See Nagle*, 63 Haw. at 392, 629 P.2d at 111; *Holdman*, 59 Haw. at 349, 581 P.2d at 1167.

Vacated and remanded.

*Daniel R. Foley* (Partington & Foley) for plaintiffs–appellants Ninia Baehr, Genora Dancel, Tammy Rodrigues, Antoinette Pregil, Pat Lagon, and Joseph Melilio.

*Sonia Faust* (*Judy M. C. So* with her on the briefs), Deputy Attorneys General, for defendant–appellee John C. Lewin.

On the briefs:

*Kirk Cashmere* and *Evan Wolfson*, for amicus curiae Lambda Legal Defense and Education Fund, Inc.

*Carl M. Varady (William B. Rubenstein, Ruth E. Harlow*, and *Matthew A. Coles* of American Civil Liberties Union Foundation with him on the brief) for amicus curiae American Civil Liberties Union Foundation of Hawaii.

*Lloyd James Hochberg, Jr. (Donald A. Beck* and *Robert R. Taylor* of Beck & Taylor with him on the brief) for amicus curiae Rutherford Institute of Hawaii.

## CONCURRING OPINION BY BURNS, J.

I concur that the circuit court's October 1, 1991 order erroneously granted the State's motion for judgment on the pleadings and erroneously dismissed the plaintiffs' complaint with prejudice. My concurrence is based on my conclusion that this case involves genuine issues of material fact. "Constitutional and other questions of a large public import should not be decided on an inadequate factual basis." 6 J. Moore and J. Lucas, MOORE'S FEDERAL PRACTICE ¶ 56[10] (2d ed. 1982) (citation omitted).

The marriage at issue in this case is the marriage specifically authorized by Hawaii's statutes. My label for this marriage is the "Hawaii Civil Law Marriage." The issue is whether the Hawaii Constitution permits the State to discriminate against same–sex couples by extending the right to enter into a Hawaii Civil Law Marriage to opposite–sex couples and not to same–sex couples.

The Hawaii Constitution mandates, in article I, section 3, that "[e]quality of rights under the law shall not be denied or abridged by the State on account of sex." It also mandates, in article I, section 5, that "[n]o person shall be . . . denied the equal protection of the laws, . . . or be discriminated against in the exercise thereof because of . . . sex[.]" Thus, any State action that discriminates

against a person because of his or her "sex" is subject to strict scrutiny.

As used in the Hawaii Constitution, to what does the word "sex" refer? In my view, the Hawaii Constitution's reference to "sex" includes all aspects of each person's "sex" that are "biologically fated." The decision whether a person when born will be a male or a female is "biologically fated." Thus, the word "sex" includes the male–female difference. Is there any other aspect of a person's "sex" that is "biologically fated"?

In March 1993, the *Cox News Service* reported in relevant part as follows:

> The issue of whether people become homosexuals because of "nature or nurture" is one of the most controversial subjects scientists have confronted in recent years.
>
> * * *
>
> Until the middle 1980s, the prevailing view among most scientists was that homosexual "tendencies" were mostly the result of upbringing. ...
>
> * * *
>
> Later, researchers at the Salk Institute in San Diego found anatomical differences between homosexual and heterosexual men in parts of the brain noted for differences between men and women.
>
> Theories gravitate to the role of male sex hormones.
>
> * * *

*The Honolulu Advertiser*, March 9, 1993, at A–8, col. 1.

In March 1993, the *Associated Press* reported in relevant part as follows:

CHICAGO – Genes appear to play an important role in determining whether women are lesbians, said a researcher who found similar results among gay men.

\* \* \*

"I think we're dealing with something very complex, perhaps the interaction between hormones, the environment and genetic components," [Roger] Gorski [an expert in biological theories of homosexuality] said yesterday.

\* \* \*

*The Honolulu Advertiser*, March 12, 1993, at A–24, col. 1.

On the other hand, columnist Charles Krauthammer reports as follows:

It is natural, therefore, that just as parents have the inclination and right to wish to influence the development of a child's character, they have the inclination and right to try to influence a child's sexual orientation. Gay advocates argue, however, that such influence is an illusion. Sexual orientation, they claim, is biologically fated and thus entirely impervious to environmental influence.

Unfortunately, as E. L. Pattullo, former director of Harvard's Center for the Behavioral Sciences, recently pointed out in Commentary magazine, the scientific evidence does not support such a claim. . . .

\* \* \*

*The Honolulu Advertiser*, May 2, 1993, at B–2, cols. 3, 4 and 5.

If heterosexuality, homosexuality, bisexuality, and asexuality are "biologically fated[,]" then the word "sex"

also includes those differences. Therefore, the questions whether heterosexuality, homosexuality, bisexuality, and asexuality are "biologically fated" are relevant questions of fact which must be determined before the issue presented in this case can be answered. If the answers are yes, then each person's "sex" includes both the "biologically fated" male–female difference and the "biologically fated" sexual orientation difference, and the Hawaii Constitution probably bars the State from discriminating against the sexual orientation difference by permitting opposite–sex Hawaii Civil Law Marriages and not permitting same–sex Hawaii Civil Law Marriages. If the answers are no, then each person's "sex" does not include the sexual orientation difference, and the Hawaii Constitution may permit the State to encourage heterosexuality and discourage homosexuality, bisexuality, and asexuality by permitting opposite–sex Hawaii Civil Law Marriages and not permitting same–sex Hawaii Civil Law Marriages.

## DISSENTING OPINION BY HEEN, J.

I dissent.[1] Although the lower court judge may have engaged in "verbal overkill" in arriving at his decision, the result he reached was correct and should be affirmed. *See* *State v. Taniguchi*, 72 Haw. 235, 815 P.2d 24 (1991).

---

[1] Retired Associate Justice Yoshimi Hayashi, whose appointment as a substitute justice in this case expired before this dissent was filed, concurs with this dissent.

I agree with the plurality's holding that Appellants do not have a fundamental right to a same sex marriage protected by article I, § 6 of the Hawaii State Constitution.

However, I cannot agree with the plurality that (1) Appellants have a "civil right" to a same sex marriage; (2) Hawaii Revised Statutes (HRS) § 572–1 unconstitutionally discriminates against Appellants who seek a license to enter into a same sex marriage; (3) Appellants are entitled to an evidentiary hearing that applies a "strict scrutiny" standard of review to the statute; and (4) HRS § 572–1 is presumptively unconstitutional. Moreover, in my view, Appellants' claim that they are being discriminatorily denied statutory benefits accorded to spouses in a legalized marriage should be addressed to the legislature.

## 1.

Citing *Loving v. Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967), the plurality holds that Appellants have a civil right to marriage. I disagree. " 'It is axiomatic . . . that a decision does not stand for a proposition not considered by the court.' " *People v. Superior Court*, 8 Cal. App. 4th 688, 703, 10 Cal. Rptr. 2d 873, 881 (1992) (quoting *People v. Harris*, 47 Cal. 3d 1047, 1071, 255 Cal. Rtpr. 352, 767 P.2d 619 (1989)).

*Loving* is simply not authority for the plurality's proposition that the civil right to marriage must be accorded to same sex couples. *Loving* points out that the right to marriage occupies an extremely venerated position in our society. So does every other case discussing marriage. However, the plaintiff in *Loving* was not claiming a right to a same sex marriage. *Loving* involved a marriage between a white male and a black female whose marriage, which took place in Washington, D.C.,

was refused recognition in Virginia under that state's miscegenation laws.[2]

The plurality also cites *Zablocki v. Redhail*, 434 U.S. 374, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978), as establishing constitutional limits on the states' right to regulate marriage. That is an undeniable principle. In *Zablocki* an application for a marriage license by a male and a female was denied because the male was not able to show, pursuant to a Wisconsin statute's requirement, that he was in compliance with all existing obligations for child support.

*Loving* and *Zablocki* neither establish the right to a same sex marriage nor limit a state's power to prohibit any person from entering into such a marriage. The plurality's conclusion here that Appellants have a right to a same sex marriage and, therefore, an evidentiary hearing is completely contrary to the clear import of *Zablocki* and *Loving*.

> Although appellants suggest an analogy between the racial classification involved in *Loving* and *Perez* and the alleged sexual classification involved in the case at bar, we do not find such an analogy. The operative distinction lies in the relationship which is described by the term "marriage" itself, and that relationship is the legal union of one man and one woman. Washington statutes, specifically those relating to marriage . . . and marital (community) property . . . , are clearly founded upon the presumption that marriage, as a legal relationship, may exist only

---

[2] Since race has historically been considered a "suspect class," the Supreme Court applied the strict scrutiny standard of review to Virginia's statute. *See* note 6, *infra*, for the definition c´ ιu ιect class.

between one man and one woman who are otherwise qualified to enter that relationship.

\* \* \*

[A]ppellants are not being denied entry into the marriage relationship because of their sex; rather, they are being denied entry into the marriage relationship because of the recognized definition of that relationship as one which may be entered into only by two persons who are members of the opposite sex.

*Singer v. Hara*, 11 Wash. App. 247, 253–55, 522 P.2d 1187, 1191–92, *review denied*, 84 Wash. 2d 1008 (1974) (footnotes omitted).

The issue of a right to a same sex marriage has been considered by the courts in four other states. Those courts arrive at the opposite conclusion from the plurality here. *See Jones v. Hallahan*, 501 S.W.2d 588 (Ky. Ct. App. 1973); *Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185 (1971), *appeal dismissed*, 409 U.S. 810, 93 S. Ct. 37, 34 L. Ed. 2d 65 (1972); *De Santo v. Barnsley*, 328 Pa. Super. 181, 476 A.2d 952 (1984); *Singer v. Hara, supra*. I do not agree with the plurality's contention that those cases are not precedent for this case. The basic issue in each of those four cases, as in this one, was whether any person has the right to legally marry another person of the same sex. Neither do I agree with the plurality that *Loving* refutes the reasoning of the courts in those four cases.

2.

HRS § 572–1 treats everyone alike and applies equally to both sexes. The effect of the statute is to prohibit same sex marriages on the part of professed or non–professed heterosexuals, homosexuals, bisexuals, or

asexuals, and does not effect an invidious discrimination.[3]

The constitutional guarantee of equal protection of the laws means that no person or class of persons shall be denied the same privileges and benefits under the laws that are enjoyed by other persons or other classes of persons in like circumstances. *Mahiai v. Suwa*, 69 Haw. 349, 742 P.2d 359 (1987).

HRS § 572–1 does not establish a "suspect" classification based on gender[4] because all males and females are treated alike. A male cannot obtain a license to marry another male, and a female cannot obtain a license to marry another female. Neither sex is being *granted* a right or benefit the other does not have, and neither sex is being *denied* a right or benefit that the other has.

My thesis is well illustrated by the case of *Phillips v. Wisconsin Personnel Comm'n*, 167 Wis. 2d 205, 482 N.W.2d 121 (Ct. App. 1992). In that case, the plaintiff, an unmarried female, was denied medical benefits for her unmarried female "dependent" lesbian companion because Phillips' state health plan defined "dependent" as spouse or children. Phillips appealed the commission's dismissal of her gender discrimination complaint and the Wisconsin Court of Appeals, in striking down her claim, stated that

---

[3] Appellants' sexual preferences or lifestyles are completely irrelevant. Although the plurality appears to recognize the irrelevance, the real thrust of the plurality opinion disregards the true import of the statute. The statute treats everyone alike and applies equally to both sexes.

[4] The plurality recognizes that the U.S. Supreme Court does not recognize sex or gender as a "suspect" classification, and thus gender has *not* historically been afforded the elevated "strict scrutiny" standard of review.

> dependent insurance coverage is unavailable to unmarried companions of both male *and* female employees. A statute is only subject to a challenge for gender discrimination under the equal protection clause when it discriminates on its face, or in effect, between males and females.

*Id.* 167 Wis. 2d at 227, 482 N.W.2d at 129 (emphasis in original and citations omitted).

Similarly, HRS § 572–1 does not discriminate on the basis of gender. The statute applies equally to *all* unmarried persons, both male and female, who desire to enter into a legally recognized marriage.[5] Thus, no evidentiary hearing is required.

The cases cited by the plurality to support its holding that Appellants are a "suspect class" are inapposite.[6] Unlike the instant case, the facts in both cases show government regulations preferring one gender (class) over another. In *Holdman v. Olim*, 59 Haw. 346, 581 P.2d 1164 (1978), the prison regulation requiring female visitors to wear proper undergarments clearly affected only female visitors to the state prison system. Male visitors to the prison were not subject to such a regulation. The supreme court explicitly referred to the regulation as

---

[5] Indeed, it may be said that the statute establishes one classification: *unmarried persons.*

[6] The plurality does not define "suspect class." A suspect classification exists where the class of individuals formed by a statute, on its face or as administered, has been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28, 93 S. Ct. 1278, 1294, 36 L. Ed. 2d 16, 40, *reh'g denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L. Ed. 2d 418 (1973).

being a sex–based classification. While the reasoning in *Holdman* is very interesting, it does not support the plurality's conclusion in this case that HRS § 572–1 creates a suspect class.

Likewise, in *Frontiero v. Richardson*, 411 U.S. 677, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973), the federal statutes required that female members of the military service, but not male members, prove that they provided over one–half of their spouse's support in order to have the spouses classified as "dependents." The statutes were clearly discriminatory, since male members of the military were favored over female members.

### 3.

Since HRS § 572–1 is not invidiously discriminatory and Appellants are not members of a suspect class, this court should not require an evidentiary hearing.[7] Neither should this court mandate that HRS § 572–1 be subjected to the "strict scrutiny" test. If anything, Appellants' challenge subjects the statute only to the "rational basis" test. *Estate of Coates v. Pacific Engineering*, 71 Haw. 358, 791 P.2d 1257 (1990). Thus, the issue is whether the statute rationally furthers a legitimate state interest. *Id.*

---

[7] The apparent result of the plurality opinion is that Appellants do not have any burden of proof on remand. According to the plurality opinion, all Appellants need to do is appear in court and say, "Here we are. The statute discriminates against us on the basis of our sex (whether male or female) and sex is a suspect class." Even in cases alleging racial discrimination (a suspect class), "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose[,]" and the burden is on the plaintiff to prove that discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 240, 96 S. Ct. 2040, 2048, 48 L. Ed. 2d 597, 607–08 (1976); *see State v. Tookes*, 67 Haw. 608, 699 P.2d 983 (1985). The plurality opinion has eliminated the need for Appellants to prove purposeful discrimination.

There is no question that such a rational relationship exists; therefore, the statute is a constitutional exercise of the legislature's authority.

In my view, the purpose of HRS § 572–1 is analogous to the purpose of Washington's marriage license statute as stated in *Singer, supra.*

> In the instant case, it is apparent that the *state's refusal to grant a license allowing the appellants to marry one another is not based upon appellants' status as males, but rather it is based upon the state's recognition that our society as a whole views marriage as the appropriate and desirable forum for procreation and the rearing of children.*
>
> . . . *[M]arriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race. Further, it is apparent that no same–sex couple offers the possibility of the birth of children by their union. Thus the refusal of the state to authorize same sex marriage results from such impossibility of reproduction rather than from an invidious discrimination "on account of sex."* Therefore, the definition of marriage as the legal union of one man and one woman is permissible as applied to appellants, notwithstanding the prohibition contained in the ERA, because it is founded upon the unique physical characteristics of the sexes and appellants are not being discriminated against because of their status as males per se.[8]

---

[8] Since, in my view, the purpose of HRS § 572–1 is to promote and protect propagation, the concern expressed in Chief Judge Burns'

*Id.* 11 Wash. App. at 259–60, 522 P.2d at 1195 (emphasis and footnote added). The court in *Singer* was considering the case in the light of that state's Equal Rights Amendment (identical to article I, § 3 of the Hawaii State Constitution). The Washington court's reasoning is pertinent, in my view, to Appellants' claim in the case at hand and supports the constitutionality of the statute.

4.

Furthermore, I cannot agree with the plurality that HRS § 572–1 is presumptively unconstitutional.

The general rule is that every statute is presumed to be constitutional, and the party challenging the law on constitutional grounds has the heavy burden of overcoming this presumption. ***Washington v. Fireman's Fund Ins. Cos.***, 68 Haw. 192, 199, 708 P.2d 129, 134 (1985), *cert. denied*, 476 U.S. 1169, 106 S. Ct. 2890, 90 L. Ed. 2d 977 (1986).

In *Washington* this court, in considering a constitutional challenge to a statutory classification, stated:

> To prevail, a party challenging the constitutionality of a statutory classification on equal protection ground has the burden of showing, "with convincing clarity that the classification is not rationally related to the" statutory purpose, ***State v. Bloss***, 62 Haw. 147, 154, 613 P.2d 354, 359 (1980), or that "the challenged classification does not 'rest upon some ground of difference having a fair and substantial relation to the object of the legisla-

---

concurring opinion as to whether the statute discriminates against persons who may be genetically impelled to homosexuality does not cause the statute to be invidiously discriminatory.

tion,'" ***Hasegawa v. Maui Pineapple Co.***, 52 Haw. 327, 330, 475 P.2d 679, 681 (1970), and is therefore "arbitrary and capricious." ***State v. Freitas***, 61 Haw. 262, 272, 602 P.2d 914, 922 (1979). *See also*, ***Schwab v. Ariyoshi***, 58 Haw. 25, 31, 564 P.2d 135, 139 (1977).

This court has ruled that:

[E]qual protection does not mandate that all laws apply with universality to all persons; the State "cannot function without classifying its citizens for various purposes and treating some differently from others." The legislature may not, however, in exercising this right to classify, do so arbitrarily. The classification must be reasonably related to the purpose of the legislation.

We set out in *Hasegawa* a two–step procedure for determining whether the statute passed constitutional muster:

First, we must ascertain the purpose or objective that the State sought to achieve in enacting [the challenged statute]. Second, we must examine the means chosen to accomplish that purpose, to determine whether the means bears a reasonable relationship to the purpose.

***Joshua***, 65 Haw. at 629, 656 P.2d at 740 (quoting ***Hasegawa***, 52 Haw. at 330, 475 P.2d at 681).

*Id.* 68 Haw. at 199, 708 P.2d at 134.

In my view, the statute's classification is clearly designed to promote the legislative purpose of fostering and protecting the propagation of the human race through

heterosexual marriages and bears a reasonable relationship to that purpose.[9] I find nothing unconstitutional in that.

### 5.

Appellants complain that because they are not allowed to legalize their relationships, they are denied a multitude of statutory benefits conferred upon spouses in a legal marriage. However, redress for those deprivations is a matter for the legislature, which can express the will of the populace in deciding whether such benefits should be extended to persons in Appellants' circumstances. Those benefits can be conferred without rooting out the very essence of a legal marriage.[10] This court should not manufacture a civil right which is unsupported by any

---

[9] In 1984, the state legislature amended HRS § 572–1 by deleting the requirement that marriage applicants show they are not impotent or that they are not physically incapable of entering into a marriage. Act 119, § 1, 1984 Haw. Sess. Laws 238. The plurality contends that the amendment refutes my assertion that the purpose of HRS § 572–1 is to foster and protect the propagation of the human race. I disagree.

A careful reading of the senate committee report on the amendment indicates that the amendment does *not* attenuate the fundamental purpose of HRS § 572–1. The intent of the amendment was to remove any impediment that may prevent persons who are "physically handicapped, elderly, or have temporary physical limitations from entering into a valid marriage relationship." Sen. Stand. Comm. Rep. No. 570–84, in 1984 Senate Journal, at 1284. The amendment accommodates only persons with physical limitations on their productive capacities. With respect to those persons, the legislature stated that the view that the primary purpose of marriage is to bear children is "narrow and outdated." That characterization should not be expanded to include the applicants in this case.

[10] I note that a number of municipalities across the country have adopted domestic partnership ordinances that confer such benefits on

precedent, and whose legal incidents — the entitlement to those statutory benefits — will reach beyond the right to enter into a legal marriage and overturn long standing public policy encompassing other areas of public concern. This decision will have far-reaching and grave repercussions on the finances and policies of the governments and industry of this state and all the other states in the country.

---

the domestic partners as the municipalities have authority to grant. Note: *A More Perfect Union: A Legal And Social Analysis Of Domestic Partnership Ordinances*, 92 COLUM. L. REV. 1164 (1992).